

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# BEAUMONT DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| | § | |
| **v.** | § | **CASE NO. 1:10-CR-29** |
| | § | |
| **ALFREDO GARCIA-ALEMAN and** | § | |
| **MIGUEL BENITEZ-RODRIGUEZ,** | § | |
| *Defendants.* | § | |

## FINDINGS OF FACT AND RECOMMENDATION
## ON MOTIONS TO SUPPRESS

Pursuant to 28 U.S.C. § 636(b) and the Local Rules for the United States District Court, Eastern District of Texas, and by order of the District Court[1], these matters were referred to the undersigned magistrate judge for a hearing and the submission of findings of fact and a report and recommendation on Defendant Miguel Benitez-Rodriguez's *Motion to Suppress Cocaine and All Other Fruits of an Unlawful Seizure and Memorandum in Support Therein* [Clerk's doc. #42], *Defendant Benitez-Rodriguez's Motion to Suppress Fruits of the Unlawful Search of His Cell Phone and Memorandum of Law in Support Thereof* [Clerk's doc. # 41], and *Defendant's Motion to Join in Co-Defendant's Motion to Suppress* [Clerk's doc. # 52].

---

[1] *See Orders* referring motions [Clerk's docs. #44, #48 and #53].

–1–

**A.** **Benitez's Motion to Suppress Cocaine and Motion to Suppress Search of Cell Phone**

Defendant Miguel Benitez-Rodriguez, hereinafter referred to as "Benitez" filed his *Motion to Suppress Cocaine and All Other Fruits of An Unlawful Seizure and Memorandum of Law in Support Thereof* on April 13, 2010. [Clerk's doc. #42].  In his motion, Benitez contends that his detention during a traffic stop and subsequent search of his vehicle was an unconstitutional seizure and seizure in violation of the Fourth Amendment.

On that same day, Benitez filed his *Motion to Suppress Fruits of the Unlawful Search of His Cell Phone and Memorandum of Law in Support Thereof* [Clerk's doc. # 41].  In that particular motion, Benitez alleges that officers seized his cellular telephone after the traffic stop and viewed telephone numbers and photographs stored on the phone.  Although Benitez acknowledges that the officers may have been able to lawfully do so as a "search incident to arrest" under *United States v. Finley*, 477 F.3d 250 (5th Cir.), *cert. denied* 549 U.S. 1353 (2007),  Benitez believes that the United States Supreme Court would not find the search of the contents of a modern cell phone to be a search incident to a lawful arrest.

**B.** **Garcia's Motion to Suppress**

On April 28, 2010, Defendant, Alfredo Garcia-Aleman, hereinafter referred to as "Garcia", filed his *Defendant's Motion to Join in Co-Defendant's Motion to Suppress* [Clerk's doc. # 52]. The Court granted this motion at the suppression hearing on May 13, 2010.  Garcia seeks to suppress evidence of the  cocaine discovered in the pickup due to his allegedly illegal detention. He does not seek to suppress  the search of any cellular telephone.

**C.** **The Government's Response in Opposition to Defendant's Motion to Suppress**

On April 13, 2010, the Government filed its *Consolidated Response to Defendant Benitez-*

*Rodriguez's Motions to Suppress* [Clerk's doc. # 46]. In its response, the Government contends that the detention of Garcia and Benitez was supported by reasonable suspicion and a search of the pickup was constitutionally permissible due to the fact that Garcia freely and voluntarily consented to the search. On May 13, 2010, this Court conducted a hearing on the suppression motions in the manner and form mandated by the Federal Rules of Criminal Procedure. This Report and Recommendation addresses issues applicable to both Benitez and Garcia.

## D.    Facts Adduced at the Suppression Hearing

Deputy Donald Dean Nance is employed as a deputy sheriff with the Jefferson County, Texas Sheriff's Department.[2] On March 10, 2010, he was on patrol on Interstate 10 in Jefferson County, Texas. At approximately 1:59 p.m., Nance was sitting in his patrol car on the shoulder of the eastbound lanes of Interstate 10 and observed a black Dodge pickup traveling eastbound at a high rate of speed. Utilizing his radar, Nance clocked the vehicle on radar at 75 miles per hour in a 70 m.p.h. zone. Nance initiated a traffic stop and activated his dashboard video camera.[3]

Nance approached the passenger side of the pickup and spoke to the two occupants through the passenger window of the pickup truck. Garcia was identified as the driver of the pickup and Benitez was subsequently identified as the passenger. While standing at the passenger window,

---

[2]    Nance had been employed with the Jefferson County Sheriff's Department since October 2008. Prior to that, he was employed as a state trooper with the Texas Department of Public Safety for approximately nine years and also as a police officer with the Beaumont Police Department for approximately five years. He has extensive training in conducting highway traffic stops. At the time of this incident, he was assigned to the Narcotics Division of the Sheriff's Department and assigned to perform highway interdiction of narcotics.

[3]    A CD which contained a video recording of the traffic stop was introduced into the record as Government's Exhibit #1.

Nance smelled the strong odor of "Bondo" and fresh paint emanating from inside of the pickup.[4] From his training and experience, Nance  was aware that Bondo was utilized in the fabrication of hidden compartments in vehicles for the purpose of transporting contraband.  He also detected a strong odor of air freshener and "different sprays" which he recognized to be used to conceal the odor of narcotics.  Nance immediately suspected that the vehicle had a hidden compartment.

It appeared to Nance that Garcia spoke some English but that Benitez did not. Nance asked Garcia for his driver's license, insurance and registration.[5]  Garcia produced a Georgia driver's license and the insurance and registration documents for the pickup.  The insurance and registration documents reflected that the truck belonged to a third party.  According to Nance, Garcia hesitantly responded when questioned that the pickup belonged to a "lady friend" of Garcia's and "it seemed like he hesitated and wasn't really sure whose car it was."  Garcia explained that he and Benitez had been in Houston, Texas and were traveling to Atlanta, Georgia.  Nance testified that he suspected that the pickup had a hidden compartment due to the fact that Garcia was driving someone else's vehicle; the registration and insurance were recently purchased; the men were coming from a known source city for narcotics; and there was the presence of the strong odor of Bondo and air fresheners and sprays.

When asked for identification, Benitez produced an international driver's license in the name of Daniel Pineda.  Nance suspected that the license was a fake because in his experience it

---

[4]  "Bondo" is a substance that is used as an automobile repair putty which sets and hardens after application.  The user can apply it, sand it to the proper shape, and prime and paint it like the material around it.  *www.wikipedia.com.*  Nance testified that fresh Bondo has a strong odor, while wet Bondo does not smell as strong.

[5]  Nance asked for the documents in English and Garcia tendered the requested information.

is common for those licenses to be a forgery.[6]  Since Benitez did not speak English, Nance relied

on Garcia to interpret the questions for Benitez.  Nance testified that Garcia had a strong accent but

Nance could understand him.

After talking to Garcia and Benitez, Nance returned to his patrol vehicle and contacted the

El Paso Intelligence Center (EPIC) for information on Garcia and Benitez.[7]  At  2:13 p.m., Nance

was notified by the authorities at EPIC that Garcia had previously been apprehended crossing the

border at Laredo, Texas with thirteen kilograms of cocaine in a hidden compartment in a truck.

After requesting backup from Lt. Tony Viator, Nance asked Garcia and Benitez to exit the

pickup.  Nance conducted a pat down search of Benitez while Viator patted down Garcia.  There

was a cellular telephone in Benitez's pocket and Nance placed the cell phone in the pickup.  The

reason he did so was because he had previously received safety information made available to

officers regarding the discovery of firearms that resembled cellular telephones and he did not feel

comfortable with Benitez having a cell phone in his possession while the investigation was being

conducted.

Nance then asked Garcia for consent to search.  He initially asked for consent in English,

asking for consent to search the vehicle and all its contents and luggage.  He then re-asked the

question in Spanish, this time asking for consent to search the vehicle.  Nance testified that he was

confident that Garcia understood him and that Garcia responded "yes" while nodding his head and

motioning toward the pickup.

---

[6]  This identification was apparently the case in this instance since Benitez later gave agents his true name after his arrest.

[7]  EPIC is an intelligence center which maintains information to assist officers in the identification of drug traffickers. According to Nance, EPIC could also give him information as to whether Garcia and Benitez had warrants and information about whether the pickup had been stolen.  Nance did not run a computer check on the licenses through his local dispatcher.

Nance then led his certified drug detection dog "Becca" around the outside of Garcia's pickup. The dog alerted at the driver's side left rear door of the pickup, the rear passenger door, and also at the bed of the pickup truck. She also alerted inside of the truck. The alerts occurred at approximately 2:18 p.m.

The truck was then searched. During the search, deputies observed that the bolts that held the rear seats in place were scratched and scarred which indicated that the seats had recently been removed. The officers could actually see small metal shavings where a tool had scarred the bolts. The officers lifted up the carpeting to remove the "kick plates" (molding that runs along the bottom of the door frame) and observed Bondo dust underneath the carpeting. Nance also observed numerous air fresheners in the pickup.

Nance then raised the hood of the truck and discovered a hidden compartment built onto the firewall of the pickup.[8] Deputies discovered that the compartment was empty after drilling into it and inserting a fiber optic scope. This process was completed at approximately 3:48 p.m. However, Nance believed that this compartment was a "decoy" and that there was another hidden compartment inside of the pickup. He based this conclusion on the fact that the Bondo around this compartment was older and did not have the strong smell that new, wet Bondo has.

The decision was made to call a wrecker and have the vehicle towed to the DEA office in Beaumont for further inspection. The trip to the DEA office took 20-25 minutes. Once the truck was taken to the DEA office, deputies removed the back seat and observed new paint and fresh Bondo around a rear door post. Nance utilized a density meter to check the floor area and received suspicious readings. He then removed the rear seat posts and discovered access doors covered with

---

[8] This was located at 2:25 p.m. and had paint and Bondo on it

fresh, wet Bondo. He pried open the doors to the posts, and discovered 14 bundles of cocaine wrapped in black tape. During the search of the truck, Garcia never revoked his consent or objected to the officers actions. Garcia and Benitez were arrested and placed in handcuffs and DEA Agent Joan Taylor advised the men of their constitutional rights in Spanish.[9] Three cellular telephones were seized from the pickup, which included the cellular telephone recovered from Benitez, and were turned over to agents with the DEA.

DEA Agent Rick Erickson took possession of the three cellular telephones and downloaded contact information and photographs from the telephones.[10] Erickson testified that he could download the information because he considered the search of the cell phones to be a search incident to an arrest. DEA agents interviewed Benitez and he, after waiving his rights, identified two of the cellular telephones as belonging to him. The DEA agents then showed Benitez the photographs from his phone and inquired about them. One photograph depicted a pickup truck similar or identical to the vehicle the men were traveling in parked in front of what appeared to be a body shop.[11] There were also photographs of cash and firearms. Benitez advised the officers that the photo of the truck was taken in North Carolina. During the interview, the agents did not specifically ask Benitez for consent to search his phone; however, he did not object while agents were looking through it and assisted them in finding particular numbers on the phone.

---

[9] This occurred at 5:20 p.m.

[10] Agent Erickson could not recall if he downloaded incoming and outgoing call logs from the phones.

[11] The Government could not determine whether the photographs in question were downloaded from the cellular telephone which was originally in Benitez's possession and placed in to the truck by Nance or from Benitez's other cell phone which was in the pickup at the time of the traffic stop.

**E.     Analysis**

The Government argues that Benitez does not have standing to contest the search of the pickup.  Although a passenger of a stopped vehicle does have standing to challenge the initial stop and seizure as unconstitutional, a passenger without a possessory interest in a vehicle lacks standing to complain of its search because his privacy expectation is not infringed.  *United States v. Roberson*, 6 F.3d 1088, 1091 (5th Cir. 1993), *cert. denied* 510 U.S. 1204 (1994).  However, because a stop of the vehicle results in the seizure of the passenger, Benitez has standing to challenge the stop of the truck and his subsequent detention.  *See id.  Se also Brendlin v. California*, 551 U.S. 249, 259, 127 S. Ct. 2400, 2407-08, 168 L. Ed.2d 132 (2007).  He also has a privacy interest in the information contained in his cellular telephones and, therefore, has standing to contest those searches.

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. CONST. AMEND. IV.  Traffic stops are deemed seizures for the purposes of the Fourth Amendment.  *United States v. Valadez*, 267 F.3d 395, 397 (5th Cir. 2001).  The legality of a traffic stop is analyzed under the framework articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).  *See Knowles v. Iowa*, 524 U.S. 113, 117, 119 S. Ct. 484, 142 L. Ed.2d 492 (1998); *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 82 L. Ed.2d 317 (1984).  Under the two-part *Terry* reasonable suspicion inquiry, we ask whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry*, 392 U.S. at 19-20, 88 S. Ct. 1868.

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is

about to occur, before stopping the vehicle. *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005), *cert. denied* 546 U.S. 1222 (2006). "The Supreme Court has stated that in making a reasonable suspicion inquiry, a court must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed.2d 740 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed.2d 621 (1981)).

The Fifth Circuit Court of Appeals has held that reasonable suspicion exists when an officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. *See, e.g., United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002). In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. *Arvisu*, 534 U.S. at 274. In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. *Terry*, 392 U.S. at 27. It is also clear, however, that reasonable suspicion need not rise to the level of probable cause. *Arvizu*, 534 U.S. at 274.

As for the second prong of the *Terry* inquiry, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop ..." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc). In the course of effectuating the traffic stop, a police officer may permissibly examine the driver's license and registration and run a computer check to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. *Id.* at 507-08. An officer may also ask the driver about the purpose and itinerary of his trip. *Id.* at 508. Indeed, the officer's questions need not even be related to the purpose of the traffic stop since "[d]etention, not questioning, is the evil at which *Terry's* second prong is aimed." *Id.*

(quoting *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993)).  Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter prolongs the detention.  *Brigham*, 382 F.3d at 510; *see also Santiago*, 310 F.3d at 341-42; *United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000); *United States v. Dortch*, 199 F.3d 193, 200 (5th Cir. 1999).  A recognized exception to that rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, the detention may continue until the new reasonable suspicion has been dispelled or confirmed.  *See Brigham*, 382 F.3d at 507; *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003), *cert. denied* 540 U.S. 1227 (2004).

### 1.    The Initial Stop

From the outset, the Government has the burden of proving that a warrantless stop and seizure comports with the Fourth Amendment.  *See United States v. Chavis*, 48 F.3d 871, 872 (5th Cir. 1995).  A motorist's expectation of privacy yields to a routine traffic stop for such violations as speeding.  *United States v. Roberson*, 6 F.3d 1088, 1091 (5th Cir. 1993), *cert. denied* 510 U.S. 1204. Neither Garcia not Benitez contend that the initial stop of the pickup was improper and the uncontroverted testimony of Nance established that Garcia was operating the vehicle at 75 m.p.h. in a 70 m.p.h. zone.  Therefore, this Court finds that the traffic stop was justified at its inception.

### 2.    The Detention of Garcia and Benitez

As for the second prong of the *Terry* inquiry, the detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges."  *Brigham*, 382 F.3d at 507.  Once an officer initiates a traffic stop, he is free to speak with the driver and the occupants and ask about the purpose and

itinerary of the trip. *Id.* at 507-08. Again, it is not a Fourth Amendment violation for an officer to question a motorist on a subject unrelated to the purpose of a routine traffic stop. *Id.* at 508. "Mere police questioning, without some nonconsensual restraint on one's liberty, is not a 'seizure' or detention." *Id.* In addition, there is no constitutional impediment to a law enforcement officer's request to examine a driver's license and vehicle registration or rental papers during traffic stop and to run a computer check on both. *Id.* at 507-08.

However, the detention for the traffic stop may last no longer than required to effect the purpose of the stop. *United States v. Cavitt*, 550 F.3d 430, 436 (5th Cir. 2008). If all computer checks come back clean, then as a general matter reasonable suspicion disappears and there is no legitimate reason for extending the stop. *Id.* As stated above, in order to prolong a detention after issuing a citation or determining that no citation should be issued, an officer must have reasonable suspicion that a crime has been or is being committed. *Id.* It must be based on more than an officer's sense that a detainee appears to have something to hide. *Id.* at 437. Mere "uneasy feelings" and inconsistent stories between a driver and a passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking. *Id.* Reasonable suspicion is present "when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant further detention." *United States v. Estrada*, 459 F.3d 627, 630 (5th Cir. 2006). To determine whether reasonable suspicion has been developed, courts must examine the totality of the circumstances, including the collective knowledge and experience levels of the officers involved. *Id.* at 631-32. "Courts must allow law enforcement officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an

untrained person." *Id.* at 632 (internal quotations omitted). Although the showing required to demonstrate reasonable suspicion is considerably less than what is necessary to establish probable cause, the Fourth Amendment requires only some minimal level for an officers actions, measured in light of the totality of the circumstances. *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992) (citing *United States v. Sokolow*, 490 U.S. 1, 6-8, 109 S.Ct. 1581, 104 L. Ed. 2d 1 (1989)). The analysis of reasonableness of factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion. *United States v. Ibarra-Sanchez,* 199 F.3d 753, 759 (5th Cir. 1999). Courts should look at the totality of the circumstances to discern whether the officers involved were presented with a "particularized and objective basis" for the suspected wrongdoing. *Arvizu,* 534 U.S. at 273. The Supreme Court instructs lower courts not to treat each factor in isolation, but rather to give due regard to the totality of the circumstances. *See United States v. Lopez-Moreno,* 420 F.3d 420, 433 (5th Cir. 2005), *cert. denied* 546 U.S. 1222 (2006). Although nervousness, giving evasive answers, and inconsistent statements may not, standing alone, constitute reasonable suspicion, the Fifth Circuit Court of Appeals has held that reasonable suspicion may arise when this type of behavior us coupled with more concrete evidence that suggests the commission of a specific offense. *Cavitt*, at 436.

In *Cavitt*, the Fifth Circuit explained:

"For example, in *Estrada*, we concluded that reasonable suspicion was established when an officer noticed 'fresh marks' and 'scratches' around the fuel tank eye piece latches and vehicle frame, which indicated the presence of an 'adhesive material' near the gas tank. *Id.* at 632. In that case, the court made much of the fact that the officer's "extensive classroom training and on-the-job experience, including an occasion at which he found illegal narcotics concealed in a gas tank in a similar fashion," led him to reasonably suspect that "a false compartment or container had been built into the fuel tank to conceal contraband [a]dhesive material is typically used to cover newly created compartments to prevent seepage of fuel

and contraband."[12]  *Id.*  Similarly, in *United States v. Sanchez*, 507 F.3d 877,882 (5th Cir. 2007), *vacated on other grounds*, — U.S. —, 128 S.Ct. 2428, 171 L.Ed.2d 227 (2008), we held that reasonable suspicion arose when an officer noticed prior to a search that the wheel rims on the detainee's truck had been painted.  *Id.*  The officer later testified that 'he knew that drug traffickers often paint their wheel rims to hide marks stemming from alterations they make to tires and rims to conceal contraband.'  *Id.*"

 *Cavitt*, 550 F.3d at 437.

This Court concludes that almost immediately after contacting the occupants of the pickup truck, Nance had reasonable suspicion to briefly detain Garcia and Benitez to investigate a possible narcotics offense.  Once at the passenger window, he immediately smelled the strong odor of "Bondo" and fresh paint coming  from inside of the pickup.  From his training and experience, Nance was well aware that Bondo was utilized in the fabrication of hidden compartments in vehicles to transport contraband.  Evidence indicating the existence of a hidden compartment supports a finding of reasonable suspicion.  *See Estrada*, 459 F.3d at 633.  His detection of the strong odor of air freshener and sprays which he recognized to be used to conceal the odor of narcotics and the fact that the occupants were returning from a "source city" for illegal narcotics furthered that suspicion.  Nance then took additional action to confirm or dispel that suspicion when he contacted EPIC for information on Garcia and Benitez.  Their notification, at  2:13 p.m., just fourteen  minutes into the traffic stop, that Garcia had previously been apprehended after officers discovered thirteen kilograms of cocaine in a vehicle's hidden compartment, served to confirm his suspicions regarding the presence of a hidden compartment in this particular vehicle.  Therefore, this Court concludes that the continued detention of Garcia and Benitez for a reasonable time for

---

[12]  The officer noticed that the adhesive material was "hardened," "discolored," and had a consistency much like "J-B Weld" or "Bondo-type" material. *Estrada*, 459 F.3d 627, 629 (5th Cir. 2006).

further investigation of a possible narcotics offense was lawful and proper.[13]

### 3. Garcia's Consent to Search the Pickup

A search conducted pursuant to consent is one of the well-settled exceptions to the Fourth Amendment's warrant requirement. *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997), *cert. denied* 523 U.S. 1036 (1998). This Court must now determine whether Garcia's consent to search the pickup truck was voluntary.

To determine whether a consent to search is voluntary, we look to (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) his education and intelligence; and (6) his belief that no incriminating evidence will be found. *Estrada*, 459 F.3d at 633-34. Although all six factors are relevant, no single one is dispositive. *Id.*

It is apparent that Garcia and Benitez were not free to leave when Garcia was asked for consent to search. However, although he was detained for purposes of the Fourth Amendment, he was not under arrest or otherwise in official custody. *See United States v. Ponce*, 8 F.3d 989, 997 (5th Cir. 1993). A close review of the videotape reveals that no coercive police procedures were utilized. On the videotape, Garcia and Benitez appear to be very cooperative. There is no indication that Nance informed Garcia that he had a right to refuse to consent to the search. However, proof that a suspect knew of his right to refuse consent, while a relevant factor, is not dispositive. *Id.* Although the record is silent as to Garcia's intelligence and education, there is no

---

[13] This Court finds that Nance had reasonable suspicion to detain the occupants of the pickup truck to investigate a possible narcotics related offense within the first few minutes of the traffic stop. This Court therefore does not reach the question of whether the time taken to run the subsequent records check through EPIC (instead of through the local dispatcher) served to facilitate the investigation of the initial purpose of the traffic stop, that is, the investigation of the traffic offense.

indication from the videotape that he was unable, for whatever reason, to understand the consequences of his consent to search. As for the last factor, it would seem that Garcia would certainly believe that no incriminating evidence would be found due to the manner in which it was secreted into a hidden compartment. *See United States v. Three Hundred Sixty-Nine Thousand Nine Hundred Eighty Dollars ($369,980)*, No. 06-40550, 214 F. App'x 432, 434 (5th Cir. Jan. 18, 2007) (finding that the suspect believed that no incriminating evidence would be found as the contraband in question was concealed in a compartment under/behind the back seat).

Based on the testimony of Nance and close review of the videotape of the exchange between Nance and Garcia, this Court finds that from a totality of the circumstances that Garcia freely and voluntarily consented to a search of the pickup.

**4.      The Dog Alert Gave Officers Probable Cause to Search the Pickup.**

Even if the Court had determined that Garcia's consent to search was not freely and voluntarily made, the search and seizure was justified because of the positive alert from the certified drug detection dog. *See United States v. Clayton*, No. 09-40779, 2010 U.S. App. LEXIS 5406, 2010 WL 1141536 (5th Cir. March 12, 2010) (per curiam) (holding that the Court did not need to address the issue on appeal of whether defendant's consent was voluntary because of the positive alert of a drug detection dog). A positive alert by a drug detection dog creates probable cause for a search of the vehicle. *United States v. Williams*, 365 F.3d 399, 404 (5th Cir. 2004). Seconds after receiving consent to search the vehicle, Nance's dog alerted on three different areas of the outside of the pickup. Once probable cause existed to stop and search the tractor-trailer, the officers were justified in searching the pickup truck at the time of the stop without first obtaining a warrant. *See United States v. Sinisterra*, 77 F.3d 101, 104 (5th Cir. 1996), *cert. denied* 519 U.S. 823 (1996).

**5.     The Search of Benitez's Cellular Telephones**

The Government contends that the search of the cell phones was proper pursuant to a consent search and also as a search incident to arrest. *See Government's Consolidated Response to Defendant Benitez-Rodriguez's Motion to Suppress, p. 5* [Clerk's doc. #46]. This Court will first address whether there was a valid consent to search Benitez's cell phones.

The Government first argues that Garcia consented to a search of the pickup and that consent extended to containers located in the pickup which would include the two cellular telephones belonging to Benitez. Therefore, the first issue to be addressed is whether Garcia had the authority to consent to the search of Benitez's cell phones. For Garcia's consent to search Benitez's cell phones to be valid, the Government must show that either Benitez himself consented to the search or that Garcia had the ability to furnish valid consent. *See United States v. Jaras*, 86 F.3d 383, 388 (5th Cir. 1996). During the roadside encounter, Benitez did not consent to a search of his cell phone. Therefore, for the search to be valid due to Garcia's consent during the traffic stop, the Government had to demonstrate the Garcia had actual or apparent authority to consent to a search of Benitez's cellular telephone. *See Illinois v. Rodriguez*, 497 U.S. 177, 186-87, 110 S.Ct. 2793, 2800-01, 111 L. Ed.2d (1990). A finding of actual authority requires proof that the consenting party and the party challenging the search "mutually used the property searched and had joint access to and control of it for most purposes, so that it is reasonable to recognize that either user had the right to permit inspection of the property and the complaining co-user has assumed the risk that the consenting co-user might permit the search." *Jaras*, 86 F.3d at 389 (citing *United States v. Rizk*, 842 F.2d 111, 112-13 (5th Cir.)(per curiam), *cert. denied* 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988)). Here, the Government introduced no testimony which indicated that

Garcia mutually used or had joint control over Benitez's cell phones.

This Court also finds that there was no apparent authority for Garcia to consent to the search of Benitez's cell phones. There was no evidence that the deputies and/or agents reasonably, although erroneously, believed that Garcia had the authority to consent to a search of Benitez's cell phones. Nance knew that at least one of the cell phones belonged to Benitez because he had taken that phone from Benitez's person and placed it in the pickup before consent to search the pickup was given by Garcia. Therefore, this Court concludes that the search of the cell phones was not justified on the basis of Garcia's consent to search the pickup truck.

The Government also contends that Benitez impliedly consented to a search of his cell phones at the DEA office when he was being questioned after the phones were searched. As stated above, Agent Erickson downloaded their pictures and texts and subsequently interviewed Benitez after he had been given his rights. Benitez identified his two cell phones and spoke to agents about the photographs which were on the phone. Erickson testified that Benitez "[e]ven showed us at one point where a particular phone number was located."

In *Jaras*, the Fifth Circuit Court of Appeals refused to find implied consent from a defendant's silence or failure to object because there was no evidence that the officers expressly or impliedly requested his permission to search. *Jaras*, 86 F.3d at 390; *see also United States v. Most*, 876 F.2d 191, 199 (D.C. Cir. 1989)(store employee's cooperation did not amount to implied consent to a search of defendant's bag where there was no proof that officers had requested permission to search the bag). It is also well established that a defendant's mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent.

At no time during the interview was Benitez asked for consent to search his two cell phones.

In fact, Agent Erickson had already downloaded (searched) the cell phones before the officers questioned Benitez about the photographs contained in the phones.  It is difficult for this Court to see how Benitez's assistance to the agents in operating the phones constituted an implied consent for a search of the phones which had already taken place.  In addition, the record is unclear as to whether Benitez's assistance in operating the phones was in response to a request for assistance by the agents or was initiated by Benitez.  Based on the totality of the circumstances, this Court finds that Benitez did not impliedly consent to a search of his cellular telephones.

The Government maintains that the search of the cell phones was proper as a search incident to arrest.  The Supreme Court has held that an officer may perform a warrantless search of a home incident to arrest, as long as the search is limited to the area within the arrested person's "immediate control," which means "the area from within which he might gain possession of a weapon or destructible evidence."  *Chimel v. California*, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed.2d 685 (1969).  The holding in *Chimel* was applied to occupants of automobiles by the U.S. Supreme Court in *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L. Ed.2d 768 (1981).  In that case the Supreme Court held that an officer who arrests the occupant of an automobile may, as a contemporaneous incident of that arrest, search the passenger compartment of the automobile and any containers found inside.  *Id.* 453 U.S. at 460.

Benitez seems to agree that under Fifth Circuit law, a search of his cell phones could lawfully be accomplished as a search incident to arrest under *United States v. Finley*, 477 F.3d 250 (5th Cir. 2007), *cert. denied* 549 U.S. 1353 (2007).  In *Finley*, the defendant was arrested at the scene of a traffic stop and officers seized a cell phone which was located in his pocket.  *Id.* at 254.  Agents examined the cell phone and discovered several text messages which appeared to be related

to narcotics use and trafficking. *Id.* The Fifth Circuit approved the search of the cell phone as a search incident to a lawful arrest. *Id.* at 259-260. The Court held that officers are not constrained to search only for weapons or instruments of escape on the arrestee's person; they may also, without any additional justification, look for evidence of the arrestee's crime on his person in order to preserve it for use at trial. *Id.* The scope of the permissible search incident to arrest extends to containers found on the arrestee's person or located within the arrestee's reach. *Id.* at 260. The Court held that *Chadwick* was inapplicable because Finley's cell phone was on his person at the time of his arrest.[14]

Benitez acknowledges that the Court is bound by Fifth Circuit precedent and believes that this Court will follow *Finley* and deny the motion to suppress. However, Benitez argues that *Finley* was wrongly decided and states that this motion to suppress was filed to preserve his right to apply for a writ of certiorari before the United States Supreme Court.[15]

However, in *Arizona v. Gant*[16], the United States Supreme Court limited the scope of a search incident to arrest. In that case, officers arrested a driver for having a suspended driver's license and placed him in the back of a patrol car in handcuffs. *Gant*, 129 S.Ct. at 1714-16. The officers then searched his vehicle and recovered a firearm and narcotics. *Id.* The Court held that

---

[14]   *United States v. Chadwick*, 433 U.S. 1, 15, 97 S. Ct. 2476, 53 L. Ed.2d 538 (1977) (once law enforcement officers have reduced luggage or other personal property not immediately associated with the person or the arrestee to their exclusive control, there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest).

[15]   Benitez argues that the United States Supreme Court would not find the search of the contents of a modern cell phone to be a search incident to a lawful arrest for the reasons stated in by the district court in *United States v. Wall*, No. 08-60016, 2008 WL 5381412 (S.D. Fla. Dec. 22, 2008) (finding that a search of the defendant's cell phone for text messages was improper partly because there was no evidence that the text messages would be deleted automatically as newer messages were received by the cell phone).

[16]   129 S.Ct. 1710, 173 L. Ed.2d 485 (2009)

the search was impermissible under the Fourth Amendment. In doing so, the Supreme Court rejected a broad interpretation of *Belton*[17] that would permit a search of the passenger compartment with no regard as to whether or not the area of the search was actually accessible to the arrestee at the time of the search. *Id.* at 1719. Instead, the Supreme Court held that the warrant exception in *Chimel* (search incident to a lawful arrest) applies when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search. *Id.* The Supreme Court noted that, when applying this rule, "it will be the rare case in which an officer is unable to fully effectuate an arrest so that a real possibility of access to the arrestee's vehicle remains." *Id.* at 1719 n.4 (citation omitted).

The Government introduced no testimony which indicated that Garcia or Benitez were unrestrained and could possibly access the cell phones located in the pickup at the time the cocaine and phones were seized during the search at the DEA office. Benitez and Garcia do not appear on the videotape of the search of the pickup conducted at the DEA office parking lot. At one point, Agent Erickson is observed talking to officers and walking around the truck. However, at or near that time one of the defendants is observed sitting on the curb in handcuffs. Agent Erickson testified that at the time he arrived at the DEA office that Benitez and Garcia had already been taken into custody. In any event, the Government has the burden to establish that an exception to the warrant requirement applies and had the burden to establish that the defendants had access to the passenger compartment. Therefore, this Court concludes that the search of the cell phones could not be legally supported by the search incident to arrest exception to the warrant requirement.

However, that is not the end of the Court's inquiry. This Court must now determine if the

---

[17] *New York v. Belton*, 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981).

search of the cell phones was permissible under the probable cause exception for automobiles which was set forth in *United States v. Ross*, 456 U.S. 798, 102 S. Ct. 2157, 72 L. Ed.2d 572 (1982). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of that vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 823. While *Gant* limited the search incident to arrest exception, it also affirmed the viability of the probable cause exception for automobiles. *Gant*, 129 S. Ct. at 1719; *see also United States v. Steele*, No. 09-10019, 353 F. App'x. 908 (5th Cir. Nov. 23, 2009). The Supreme Court noted that "*Ross* allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader." *Gant*, 129 U.S. at 1721.

As stated above, after the drug detection dog alerted to the presence of narcotics there was probable cause to search the vehicle and its contents under the automobile exception to the warrant requirement. *See United States v. Zucco*, 71 F.3d 188, 191-92 (5th Cir. 1995), *cert. denied*, 516 U.S. 1182, 116 S.Ct. 1284, 134 L. Ed.2d 229 (1996). The automobile exception to the warrant requirement allows officers to search closed containers found in the automobile. *Ross*, 456 U.S. at 822. The search may include "the containers within it where they have probable cause to believe contraband or evidence is contained. *California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L. Ed.2d 619 (1991).

Recently, several district courts have held that officers may search the contents of a cell phone (just as it allows searches of closed containers) seized during a traffic stop as long as there is probable cause to believe the phone contained evidence of a crime. *See United States v. Monson-Perez*, No. 4:09CR623, 2010 U.S. Dist. LEXIS 20569, 2010 WL 889833 (E.D. Mo. March 8, 2010); *United States v. James*, No. 1:06CR34, 2008 U.S. Dist. LEXIS 34864, 2008 WL 1925032

(E.D. Mo. April 29, 2008); *United States v. Fierros-Alvarez*, 547 F. Supp.2d 1206 (D. Kan. 2008). This Court finds these cases persuasive.

This Court finds that there was probable cause to search the cell phones under the automobile exception. Almost immediately after the truck was pulled over, Nance smelled the strong odor of Bondo and air freshener. Information from EPIC revealed that Garcia had previously been apprehended when a search of the vehicle he had been operating at that time revealed a hidden compartment containing cocaine. Nance's certified drug detection dog alerted on Garcia's vehicle and Nance observed scratch marks on bolts attaching the seats to the bottom of the truck. Three compartments were eventually discovered in the vehicle and two of the compartments contained a large amount of cocaine. Pagers and cell phones have been held by other circuits to constitute tools of the drug trade. *United States v. Munera-Uribe*, No. 98-20438, 1999 U.S. App. LEXIS 18426 at *19 (5th Cir. Aug. 5, 1999) (citing *United States v. Cleveland*, 106 F.3d 1056, 1061 (1st Cir. 1997); *United States v. Sasson*, 62 F.3d 874, 886 (7th Cir. 1995)).

In conclusion, because probable cause existed to believe that evidence of a crime would be found in the cell phone information and photographs, the automobile exception gave law enforcement officers latitude to search Benitez's cell phones like it would allow the search of other closed containers in the pickup truck.[18]

## F.    Conclusion and Recommendation of the Court

Accordingly, having considered the relevant legal factors and evidence presented, and based upon the facts and conclusions law stated herein, the undersigned magistrate judge recommends that

---

[18] There is a conceivable argument that the cell phone taken from Benitez and placed into the truck should not be subject to a search pursuant to *Ross* due to the fact that Nance is the person who placed it there. However, if that particular cell phone had remained in Benitez's possession at the time of arrest it would be subject to a search incident to arrest pursuant to *Finley*.

the District Court deny Defendant Miguel Benitez-Rodriguez's *Motion to Suppress Cocaine and All Other Fruits of an Unlawful Seizure and Memorandum in Support Therein* [Clerk's doc. #42] and *Defendant Benitez-Rodriguez's Motion to Suppress Fruits of the Unlawful Search of His Cell Phone and Memorandum of Law in Support Thereof* [Clerk's doc. # 41].

## F.    Objections

Objections must be: (1) specific, (2) in writing, and (3) served and filed within fourteen (14) days after being served with a copy of this report.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 1(a), 6(b), and 72(b). A party's failure to object bars that party from: (1) entitlement to *de novo* review by a district judge of proposed findings and recommendations, *see Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988), and (2) appellate review, except on grounds of plain error of unobjected-to factual findings and legal conclusions accepted by the district court, *see Douglass v. United Servs. Auto. Ass'n.*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).  The constitutional safeguards afforded by Congress and the courts require that, when a party takes advantage of his right to object to a magistrate's findings or recommendation, a district judge must exercise its nondelegable authority by considering the actual evidence and not merely by reviewing and blindly adopting the magistrate's report and recommendation.  *See Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir. 1983); *United States v. Elsoffer*, 644 F.2d 357, 359 (5th Cir. 1981) (per curiam).

**SIGNED this the 9th day of June, 2010.**

_____
KEITH F. GIBLIN
UNITED STATES MAGISTRATE JUDGE